## BOYER v. TUCKER, et al., Appellants.

The court having examined the evidence in this case in detail, finds that the deed under which plaintiff claims title to the land in controversy, is fraudulent and void, and that he is, therefore, not entitled to maintain the action. The decree of the circuit court is, therefore, reversed.

*Appeal from Bates Circuit Court.*—Hon. F. P. WRIGHT, Judge.

REVERSED.

*W. P. Johnson, R. O. Boggess* and *C. C. Bassett* for appellants.

*E. J. Smith* for respondent.

SHERWOOD, C. J.—Boyer instituted this proceeding to set aside, as a cloud upon his title, a deed obtained by Tucker as the result of a sale, under execution, of certain land, sold as the property of one Irvin Walley. The indebtedness in favor Riggs and Swift and against Walley, and upon which judgment was rendered and execution issued, existed on the 7th day of February, 1873, when the deed from Walley to his brother-in-law, Boyer, was made. On the 27th day of February, 1873, suit was brought by Bates county against Smith, collector of that county, and his sureties, Walley among the number, for the recovery of $45,000—alleged to have been collected by Smith and

not accounted for.   This case is reported, 65 Mo. 464. Tucker, in his answer, charged that, in order to defeat the collection of the debt of Riggs and Swift, and also any judgment which the county might recover, Walley and Boyer conspired together for the purpose mentioned, and the former made the latter the deed of February 7th, 1873.

These allegations of the answer were denied, and, upon final hearing, a judgment was rendered setting aside the deed of Tucker, and vesting whatever title he acquired, by reason of the sheriff's deed, in the plaintiff, Boyer.

We regard it as altogether immaterial whether Tucker was apprised of certain irregularities in the partition proceedings, and of the intention of the parties in making the five quit claim deeds, to correct whatever mistakes may have occurred in those proceedings.   Nor is it at all important that Tucker purchased the land " on a speculation," and for the small sum of $23.   The effect of the sheriff's sale and deed were to pass to Tucker whatever right, legal or equitable, Walley had in the land.   Tucker's rights in the premises were of just as high a nature as though he had been a creditor of Walley at the time of his purchase. . *Ryland v. Collison,* 54 Mo. 513.   If the transaction between Boyer and Walley was a fraudulent one, then a resulting trust immediately arose in favor of the creditors of the latter, which trust could as well be enforced in favor of Tucker, as of any creditor.   The paramount question then, in this case, is, whether the fraudulent purpose charged in Tucker's answer, really existed.   We have no doubt that it did.   Either Boyer's arithmetic, or else his memory, must be greatly at fault, because, with all his efforts in that direction, he was not able to show himself the possessor of anything like the sum of money he says he paid Walley for the land.

He claims to have paid $4,000 ; $1,500 in cash, $1,100 in an account owing to him by Walley for cattle, $500 in a school debt, which he states he assumed, and to have given his two notes, one for $700, and the other for $200, which he

says he afterwards paid. He swears positively to the payment of every dollar of the $1,500, and even pretends to give the denominations of some of the bills; but, as to these, he is not corroborated by Walley, who states positively there were no $100 bills, nor does he think there were any $50 bills. In reference to the amount of money Boyer had on hand at the time the deed of February 7th, 1873, was made, it is utterly irrelevant to inquire what amount of money he had in preceding years, since we have it from his own lips that, on the 1st day of August, 1872: "I do not know whether I had any money at that time or not; I think probably I had some. I suppose I had some money at that time. Perhaps $100, $200, or $300; cannot say how much." His sworn assessment list delivered to the assessor, shows not a dollar was possessed by him on that day; nor does he give in the $1,100—which he claims Walley owed him at that date—for cattle sold him. He says he sold enough of cattle and grain to make up, with the $450 he claims to have obtained from his father, the $1,500 alleged to have been paid Walley. These are his figures of what he sold after August, 1872:

| | |
|---|---:|
| 3 or 4 cows at $30 each in fall to butchers at La Cygne, | $120 |
| 1 horse to Grigg, | 75 |
| 1 horse to Brown, | 65 |
| 300 bushels of wheat to two or three different merchants at La Cygne, Kas., whose names he does not know, | 300 |
| 200 bushels of rye to same parties, | 100 |
| Making | $660 |
| Of this amount he says he paid for taxes $80 or $90; borrowed money, $50 to $75; say $80 plus $50, | 130 |
| Leaving | 530 |
| This, with the sum from his father, | 450 |
| Would make but | 980 |
| Leaving a deficit of ($1,500—980) | 520 |

But he says he kept several hundred dollars in his house from January, 1871, till he bought Walley's land. If so, then his affidavit before the assessor was untrue, as well as the subsequent statement just quoted above, that he did not know whether he had any money on the first day of August, 1872, or not—and these discrepancies abound in his testimony. He says he borrowed the $500 of his father in November, or December, 1872, receiving a check for the amount; borrowed it to buy cattle with. Shortly after making this statement, he says: "After I got the check, I sold a horse to one Rankin for $80. This was in the spring of 1872."

In another part of his testimony, we find him stating that notwithstanding the large amount of money he had on hand in 1873, just before he bought the land of Walley, that he was repeatedly dunned for, and compromised a little debt of $3 or $4; and when sued by Nichols for $8, begged and obtained two months additional time, for which extension he paid interest. Nor is he more fortunate in his testimony as to the payment of the note for $700 which fell due in six months. In order to raise the money to pay this note he says he sold:

| | |
|---|---:|
| 1 horse to Erwine | $ 80 |
| 2 or 3 cows at $20 each to butchers at LaCygne | 60 |
| 10 or 12 hogs to hog dealers | 60 |
| 2 steers to Robert Kyle | 40 |
| Couple loads corn at LaCygne | 15 |
| Making only | $255 |

But he says he never sold steers to Kyle but once, and that he sold them to pay the $700 note, and not the $1,500 in cash. In another part of his testimony, however, he states that it was early in the spring of 1872, that he sold the steers to Kyle. Now these statements will not bear scrutiny; for the note for $700 was not in existence for nearly a year after the last named date; and thus the singular spectacle is presented of money being raised to meet

Boyer v. Tucker.

a liability that had not then been incurred. So that we must deduct the $40, obtained from Kyle in the spring of 1872, (because Boyer did not retain any of it on the 1st day of August of that year) from $255, which would leave $215, to discharge a $700 note and interest. But he says, "I might have had $200 more money than the $1,500, when I paid it to Walley." Taking this assertion of a mere possibility as the declaration of a truth, there would be only $415 to meet that note. In addition to the foregoing, which shows, in a marked manner, Boyer's financial inability to purchase Walley's land, it is in evidence that Joshua Evans, whose lease from Walley expired on the 1st day of March, 1873, leased the premises for another year, again from Walley, in that month. Henshaw, one of the attesting witnesses, is positive that the lease was signed from the 1st to the 3d of March, 1873. And the lease itself states that Evans' term was to begin on the 1st of March, 1873, and terminate on the 1st of March, 1874. These statements of Evans and Henshaw as to the time of signing the lease are not contradicted by A. G. Walley, the other attesting witness. Irwin Walley makes a statement to the contrary, saying that the lease was signed on the day the indenture bears date, viz: the 27th day of January, 1873, and afterwards that he transferred the lease to Boyer.

He admits, however, that the date of the lease was left blank, and that he filled it in. Boyer also corroborates this statement as to the time the lease was assigned to him by Walley. But a copy of the lease is before us and we discover no such assignment, and at any rate we prefer the testimony of Evans and Henshaw, who are disinterested witnesses. If their testimony is to receive the preference as to credibility, then it is truly remarkable, if the transaction between Boyer and Walley was *bona fide*, that the latter should venture, as the owner, to lease land three weeks after he had conveyed it by warranty deed to another. Even laying the date of the lease aside, there is

abundant evidence all through the record that the transaction between Boyer and Walley was a mere sham,.and this was manifested in an infinite variety of ways: Walley ·continued to exercise acts of ownership over the place; ·plowed the hedge around the farm in the summer of 1873 himself; in the spring of that year, and two or three weeks after the lease was signed, hired Evans to make several thousand rails on the place, which Walley afterwards had hauled by his hand and team, and agreed with Evans to pay him for repairing the fence. Walley also hired Shelton to work on the farm, which he did from March 1st, 1874, till May, 1875, at $150 per year, and directed all of his work, and, as late as 1875, Shelton was sent by Walley with his team to Fort Scott to bring down Mills to the farm as the ostensible tenant of Boyer. Moreover, neither Boyer nor Walley informed Evans until a short time before, or just after the sheriff's sale to Tucker, that Boyer had bought the land; nor in 1873, did Boyer include in his assessment list the land alleged to have been bought from Walley.

When we consider the evidence in this case, a resume of which.has been given, we are at a loss to discover on what theory the court below acted in its rulings, unless it was that the smallness of the consideration paid by Tucker was not without its influence. This consideration, as before stated, possesses no weight with us, nor should it under the circumstances detailed. He was guilty of no fraud in purchasing at sheriff's sale, except it be fraudulent.to participate in a species of sale to which the law, in its wisdom, has attached the greatest publicity and· invited the largest competition.

Besides, Tucker is not asking equitable relief, and even if he were, his equities, if we are to regard the evidence contained in this record, need not shun comparison with those asserted on behalf of the plaintiff. The judgment is reversed and the petition dismissed. All concur except Judge NAPTON, who dissents.