Woodard v. Mastin.

WOODARD, *Appellant*, v. MASTIN *et al.*

DIVISION TWO.

1. **Fraudulent Conveyances**: SUBSEQUENT PURCHASE AT EXECUTION SALE. Where a purchase at a sale under a deed of trust is fraudulent as to creditors, it seems that a subsequent purchase at an execution sale by the same grantee will not protect him.

2. ——: ——. The evidence in this case reviewed, and *held*, reversing the finding of the trial court, that the sale made under the deed of trust was procured by the purchaser in fraud of creditors.

Woodard v. Mastin.

3.     ——— : PURCHASE AT EXECUTION SALE. Lands fraudulently conveyed may be sold on the execution of a creditor as if the conveyance had not been made, and the purchaser, on proof of the fraud, will be entitled to a decree vesting the title in him.

4.     ——— : ———. The fraudulent grantee will in such case be deemed a trustee for the later purchaser.

5.     ——— : SHERIFF'S SALE : INADEQUACY OF CONSIDERATION. Inadequacy of consideration is a defense to title to property obtained at a sheriff's sale, where it has resulted from the efforts of the debtor to place the property beyond the reach of his creditors.

6.     Equity : MAXIM. He who seeks equity must do equity.

7.     Fraudulent Conveyance : SUIT BY EXECUTION PURCHASER TO SET ASIDE MEASURE OF RELIEF. In a suit by a creditor, who is also the execution purchaser, to set aside a conveyance made in fraud of creditors, the purchase may be disregarded and the property be sold to satisfy the judgment, interest and expenses of litigation, where it would be inequitable to give the purchaser the whole property.

*Appeal from the Greene Circuit Court.*—C. V. BUCKLEY, ESQ., Special Judge.

REVERSED AND REMANDED.

*C. H. Montgomery* for appellant.

(1) The court erred in dismissing plaintiff's bill and rendering judgment for defendants. The questions in this case have already been decided in favor of plaintiff. *State v. McBride*, 81 Mo. 349; s. c., 15 S. W. Rep. 72. (2) Purchases at public sales with debtor's money are fraudulent and void. Bump on Fraud. Conveyances [2 Ed.] p. 255; *Gutzweiler v. Lackman*, 23 Mo. 168; *Benne v. Schnecko*, 100 Mo. 251. (3) Such public sales are fraudulent where the money is paid by others. (4) And may be void though valuable consideration be paid. *Johnson v. Sullivan*, 23 Mo. 482; *Sexton v. Anderson*, 95 Mo. 379; *Allen v. Berry*, 50 Mo. 90; *Slatterly v. Jones*, 96 Mo. 216. (5) Transactions between relatives are always subjected to more jealous scrutiny than when occurring between mere

strangers. *Leavitt v. LaForce*, 71 Mo. 354; *King v. Moon*, 42 Mo. 551. ( 6 ) "Notice of fraud imputed to one who has sufficient information to put him on inquiry." *Rupe v. Alkire*, 77 Mo. 643; *Leavitt v. LaForce*, 71 Mo. 354; *Stern v. Mason*, 16 Mo. App. 478; 3 McCrary, 638; 11 Fed. Rep. 559; *Machine Co. v. Clayborne*, 6 Fed. Rep. 438; *Harrall v. Beall*, 17 Wallace, 590. ( 7 ) "Fraud may be presumed in equity, but must be proved at law. Therefore, courts of equity will grant relief, upon the ground of fraud established by presumptive evidence, which courts of law would not always deem sufficient to justify a verdict." *King v. Moon*, 42 Mo. 551. ( 8 ) The actual participants in the fraudulent conspiracy to wreck the North Center Creek Mining & Smelting Company, and to cover up its assets from the creditors, were all directors and officers of that company, and the company was affected by this fraud. "The fraud of an agent binds his principal." Wait on Fraud. Con. & Creditors' Bills [ 2 Ed.] sec. 198, p. 282. This principle applies with peculiar force to the case at bar, because a corporation only acts by its directors and officers. Their acts are the acts of the corporation. ( 9 ) The rules of law governing fraudulent conveyances apply to corporations the same as to individuals. Wait on Fraud. Convey., sec. 199. ( 10 ) Fraud may be inferred from circumstances, and failure on the part of persons charged with fraud to produce evidence in their power raises against them the presumption of fraud. *Baldwin v. Whitcomb*, 71 Mo. 651; *Maybary v. McClurg*, 74 Mo. 591; *Eck v. Hatcher*, 58 Mo. 239; *Cass Co. v. Green*, 66 Mo. 498; *Henderson v. Henderson*, 55 Mo. 534. ( 11 ) Resale without readvertisement of property at a trustee's sale is not permissible. *Judge v. Booge*, 37 Mo. 544; *Barnard v. Duncan*, 38 Mo. 170; *Dover v. Kennerly*, 38 Mo. 469; *Sherwood v. Saxton*, 63 Mo. 78. ( 12 ) Officers of an insolvent corporation cannot procure a fraudulent purchase of their company's property,

and hold it against creditors. *McAllen v. Woodcock*, 60 Mo. 174; *Bent v. Priest*, 86 Mo. 475; *Patrick v. Gas Co.*, 17 Mo. App. 462; *State v. McBride*, 15 S. W. Rep. 72. (13) Where the estate becomes reinvested in the original party to the fraud the original equity will reattach in favor of creditors. Wait's Fraud. Convey. [2 Ed.] p. 525. (14) The Mastins, being fraudulent grantees, acquired no title at the United States marshal's sale. (15) Property may be sold on creditor's execution, notwithstanding fraudulent conveyance. It is the settled law of Missouri that lands fraudulently conveyed may be sold on the execution of a creditor as though no such fraudulent conveyance had ever been made. Such conveyance as against creditors is clearly and utterly void. R. S. 1879, sec. 2499; *State ex rel. v. McBride*, 105 Mo. 365; *Slatterly v. Jones*, 96 Mo. 219; *Ryland v. Callison*, 54 Mo. 513; *Bobb v. Woodard*, 50 Mo. 95; *Jacobs v. Smith*, 89 Mo. 682; *Lionberger v. Baker*, 88 Mo. 447; *Zoll v. Soper*, 75 Mo. 460. Plaintiff is entitled to a decree divesting all the right, title and interest of defendants in the land in controversy and vesting it in plaintiff, and for an accounting of royalty since plaintiff's purchase in December, 1884. Courts of equity may in the same proceeding divest title out of a fraudulent grantee, and, also, invest it in the plaintiff. *Ames v. Gilmore*, 59 Mo. 537; *Allen v. Berry*, 50 Mo. 91.

*Phelps & Brown* and *C. O. Tichenor* for respondents.

(1) Appellant's claim is inequitable. He seeks to secure property worth $50,000 for $50, and at the same time to reap the benefit of the $4,500 paid by D. C. Mastin to Wahl on account of the valid deed of trust. He who seeks equity must do equity. *Randolph's Ex'r v. Quidnick Co.*, 135 U. S. 457. (2) Had D. C.

Mastin actually entered into a contract with the company to buy in the property for the amount of the debt secured by the deed of trust, it would have been neither illegal nor fraudulent. *O'Fallon v. Clopton*, 89 Mo. 290; *Wicker v. Hoppock*, 6 Wallace, 94; *Small v. Jones*, 1 Watts & S. 128. (3) The fact that the property did not bring its full value does not render the sale void. *Gordon v. O'Neil*, 96 Mo. 355; *Briant v. Jackson*, 99 Mo. 399. (4) Fraud must be proved, and the burden was on appellant to do so. *Keiser v. Gammon*, 95 Mo. 224; *Funkhouser v. Lay*, 78 Mo. 458; *Evans v. David*, 98 Mo. 411. (5) Had J. J. Mastin been something more than a nominal director, taking no part in the affairs of the company, and had he bought at the sale under the deed of trust or under the judgment in the United States court, it would not have been void. *Kitchen v. Railroad*, 69 Mo. 224; *Oil Co. v. Marbury*, 91 U. S. 589; *Ashhurst's Appeal*, 60 Pa. 315. (6) The delay of appellant strikes even the counsel for appellant. He calls attention to it. D. C. Mastin purchased under the deed of trust, November 24, 1879. Appellant was present at the sale. He got his judgment December 15, 1880. He did not get an execution until October 28, 1884, the sale taking place December 11. Appellant waited over five years. Why did he delay this great length of time? He does not testify in his case. Mining property fluctuates in value more than any other kind of realty, and hence appellant was called upon to act quickly. He could not lie by and speculate upon the chances of the future. *Oil Co. v. Marbury*, 91 U. S. 592, and cases cited in opinion; *Samuel v. Holliday*, 1 Woolw. 416, and cases cited; 78 Pa. 394; *Kitchen v. Railroad*, 69 Mo. 264.

THOMAS, J.—This is a bill in equity to set aside sales under deed of trust and execution, as having been made in fraud of creditors.

In 1877, John J. and Thomas H. Mastin organized a mining corporation known as the "North Center Creek Mining & Smelting Company." John J. Mastin was made president of this company when it was first organized. Thomas H. Mastin was, however, after the first year, its president, and Wm. Toms was its superintendent. This company engaged in the business of mining and reducing zinc and lead ores, and for that purpose expended large sums of money in erecting buildings, furnaces and other necessary appliances on lands it owned near Webb City, Jasper County, Missouri. On the twenty-seventh day of January, 1879, the company being indebted to John Wahl & Co. in the sum of about $2,800 executed a deed of trust to H. W. Ocker, trustee of said Wahl & Co., on the undivided half of the northwest quarter of the northwest quarter of section 17 ; the undivided seven-twelfths of lot 1, of the northwest quarter, and the north half of the northeast quarter of section 18, township 28, range 32, in Jasper county, and on all the personal property, machinery, tools and fixtures used in and upon said premises or in connection with the mining business of said company, and in part consisting of the following : One large engine, three large boilers, two detached boilers, nineteen steam jigs, one crusher, four steam pumps, two steam hoisters and all belts, pulleys, rollers and other appurtenances, as well as the blacksmith shop, office and all the tools and furniture therein, which deed of trust was made to secure to said Wahl & Co. the payment of the said sum of $2,800, and further advances to be made by said Wahl & Co. to said company, not exceeding, in all, the sum of $10,000, at any one time over and above manufactured products actually on hands, and it provided that, in case any sum of money remained unpaid after the expiration of ninety days, the trustee might, upon the usual terms, sell said land at the courthouse door in the city of Carthage, Jasper county, and the said personal property upon the premises, to satisfy such indebtedness.

In pursuance of the power contained in this deed of trust, the trustee did, on the twenty-fourth day of November, 1879, sell all said land and personal property to D. C. Mastin, for $4,485. On the fifteenth day of December, 1880, plaintiff obtained judgment in the circuit court of said county, against said company for the sum of $1,564.68 with costs.   In December, 1884, the interest of said company in the northwest quarter of the northwest quarter of section 17, township 28, range 32, was sold by the sheriff of said county, by virtue of an execution issued on said judgment, and plaintiff became the purchaser thereof for the sum of $50 and received the sheriff's deed therefor, dated December 11, 1884, and he brought this suit to cancel and set aside the sale, and, also, a deed made under said deed of trust to D. C. Mastin, averring that it was procured to be made by the president and the other officers of said company, for the purpose and with the intent to defrau l the creditors of said company, among whom was plaintiff, and averring further that D. C. Mastin, the purchaser at that sale, was cognizant of the purposes and designs of said officers, and that he did not furnish the money for the purchase, but that it was furnished by the president and officers of said company.

Plaintiff also alleged that in further pursuance of said fraudulent design and conspiracy to cheat and defraud and hinder and delay this plaintiff and various other creditors of said company out of their just claims and demands against said company, and to strengthen, if possible, the pretended and fraudulent claim of defendant, David C. Mastin, to the undivided half of the northwest quarter of the northwest quarter of section 17, township 28, of range 32, in Jasper county, Missouri, said Thomas H. Mastin, John J. Mastin, William Toms, the North Center Creek Mining & Smelting Company and David C. Mastin, this defendant, on the twenty-fifth day of March, 1881, procured an undivided one-half of the northwest quarter of the northwest quarter

of the said section 17, township 28, of range 32, in
Jasper county Missouri, to be sold under an execution
issued out of the circuit court of the United States, for
the western division of the western district of the state
of Missouri on a judgment in favor of the Metropolitan
National Bank of New York, and against the North
Center Creek Mining & Smelting Company, John J.
Mastin and Thomas H. Mastin, defendants, to this
defendant, David C. Mastin, for the grossly inadequate
price and sum of $125, when in truth and in fact said
property was well worth at the time the sum of $20,000;
that said property was so purchased at said sale by said
David C. Mastin, for the purpose of hindering and delay-
ing and cheating and defrauding said creditors and this
plaintiff out of their just claims and demands.

D. C. Mastin answered denying the fraud on his
part and alleging his good faith in the two purchases of
the property and the payment for it by himself.   He
also alleged that since the institution of this suit he
had sold the land in controversy to John J. Mastin, and
that he and John J. Mastin since said trustee's sale had
expended "the sum of $48,000 in removing liens upon
said land and property."

John J. Mastin filed separate answer in which he
set up that the trustee's and marshal's sales to D. C.
Mastin were made in good faith, and for value, and that
he and D. C. Mastin had ,aid $48,000 in removing liens
and demands against the company.

The suit was originally begun in 1884, in Jasper
county, and was, on stipulation, transferred to Greene
county, where a trial was had which resulted in the
dismissal of plaintiff's bill, and he has appealed to this
court.

I.   The main question presented to us for decision
is one of fact upon the evidence contained in the record.
Were the sales of the property in dispute by the trustee
and marshal fraudulent as to the creditors of said com-
pany, as alleged by plaintiff?   In the discussion of the

question, it will not be necessary for us to examine the
*bona fides* of the sale by the marshal ; for it is conceded,
if not in terms, at least tacitly, that, if the trustee's sale
was fraudulent as alleged, the subsequent purchase of
the same property by the fraudulent grantee would not
help him.

We will first examine this transaction in the light
of the evidence presented by defendants, which is sub-
stantially as follows :  D. C., Thomas H. and John J.
Mastin were brothers.  D. C. Mastin was a farmer and
dealer in stock and lived on a farm near Kansas City.
Thomas H. and John J. Mastin up to 1878 had been
engaged in the banking business in Kansas City, but
during that year their bank failed, leaving John J.
Mastin financially wrecked.  The mining plant, outside
of the lands, of the North Center Creek Mining & Smelt-
ing Company near Webb City cost at least $40,000.
Thomas H. Mastin went to St. Louis, after the Wahl
deed of trust was given, to look after some debts the
company owed there, and while there met: John Wahl
and told him the company would not be able to pay him,
and if he wanted his money he would have to sell the
property under his deed of trust.  Accordingly, the real
estate and personal property conveyed by the deed of
trust was advertised for sale on November 24, 1879, the
real estate to be sold at the courthouse door in Car-
thage, and the personal property at the works at Webb
City.  At this time Thomas H. and John J. Mastin and
Wm. Toms were the directors ; Thomas H. Mastin was
president and Wm. Toms was superintendent of the
company.  The capital stock of the company was
$50,000, and was owned by Thomas H. and John J.
Mastin, Wm. Toms and Mrs. Henning, the Mastins
being the owners of two-thirds or three-fourths of it.
Toms staid at the works, and was the active manager.
Thomas H. Mastin visited the works about twice a
month.  When the property was advertised for sale,
Thomas H. Mastin went to his brother, D. C. Mastin, and

told him this property was advertised for sale to pay about $4,500; that it was his opinion, under the depressed condition of mining matters, and the failure the company had made down there, and on account of the financial depression there was all over the country, the property would not perhaps sell for more than the mortgage, and, if it did not bring more than that, he thought it would be a good investment, and he would advise him to buy it if it sold for that amount of money. Upon the strength of that advice he went down to Carthage with Thomas H. Mastin, for the purpose of buying the property. They went down from Kansas City the day before the sale. D. C. Mastin had never seen the property up to this time. They went through the works and then went to Carthage. We will let Thomas H. and D. C. Mastin state what then occurred in the language of the record.

Thomas H. Mastin testified as follows: "*Q.* Where was this real estate sold? *A.* Sold at the courthouse door in Carthage, Jasper county, Missouri.

"*Q.* Did you intend to buy any property at that sale? *A.* No; I did not; I didn't have any money.

"*Q.* Well, then, why did you attend the sale? *A.* I went along with my brother, David C. Mastin. I had suggested to him that I thought he could buy this property at this sale, and it would be a good investment at this price, and I went along with him, to be with him at that sale.

"*Q.* Did you have any other business there? *A.* No, sir; I don't think I had any other business.

"*Q.* There were two sales of that real estate at the same place, and about half an hour apart, were there not? *A.* Yes, sir.

"*Q.* You were present at the first sale, were you not? *A.* Yes, sir.

"*Q.* What real estate was sold at this first sale? *A.* The whole of the real estate in that deed, I think.

"*Q.* John H. Taylor was present at the first sale, was he not? *A.* Yes, sir.

"*Q.* What was he there for? *A.* Well, I don't know what he was there for; I recollect that he bid on the property.

"*Q.* When the real estate was offered for sale by the trustee for the first time, John H. Taylor bid the whole amount of the Wahl debt and the costs, did he not? *A.* I don't know just what his bid was; I don't recollect just what that was. I presume that was his bid though.

"*Q.* After the bid, your brother, David C. Mastin, bid a few dollars more, and it was knocked down to him at a few dollars more than the Wahl debt, was it not? *A.* Yes, sir.

"*Q.* What happened next? *A.* We went from there to the office of Phelps & Brown, attorneys at law, with the trustee who sold it, Mr. Ocker,—went there to have the deed made. When we got there, and proceeded to make the deed of the real estate only, and it was the understanding of David C. Mastin that he had bought both the real estate and personal property, and he objected to taking a deed of that kind, and refused to take the deed and pay for it, because they didn't include the personal property; and on the strength of that Mr. Ocker went back and resold the property.

"*Q.* You say it was his understanding that he was to get that? How do you know that this was his understanding? *A.* Because I heard him say so. I had been with him the day before, and we had looked at the property at Webb City, and had looked at the personal property as well as the real estate.

"*Q.* You were president of the North Center Creek Mining & Smelting Company at the time? *A.* Yes, sir.

"*Q.* What was done there at the sale by the trustee immediately preceding that first sale of the real estate? I mean, what papers, if any, did he read? *A.*

Although I have no distinct recollection of it I have no doubt that he read the advertisements, and then offered the property for sale and asked for bids.

"*Q.* Was D. C. Mastin present when this was read, if it was read? *A.* Yes, sir.

"*Q.* Did D. C. Mastin claim at the time he objected to taking this property at his bid that there was any misrepresentation made on the part of the trustee? *A.* He said that his understanding was that he thought he was getting it all when he bid for it.

"*Q.* Did you insist on your brother, David C. Mastin, taking the property at his bid? *A.* No, sir.

"*Q.* Why did you not? *A.* Because I didn't want to I suppose.

"*Q.* You were president of the company, were you not? *A.* Yes, sir.

"*Q.* You were the officer to look after the interests of the company, to see that they were protected? *A.* I was president of the company, and that carries all there is in it. I didn't go there as president of the company to look after that sale.

"*Q.* Did you insist that the property should be resold, and if it brought less than his first bid that it should be charged up to your brother, David C. Mastin, and that suit be brought against him for the balance? *A.* No, sir; I didn't.

"*Q.* Why didn't you? *A.* Because I didn't see fit to.

"*Q.* Did you insist that the property should be readvertised before it was sold? *A.* No, sir; I did not.

"*Q.* Why did you not? *A.* Because I didn't see fit to. I thought that would be a useless proceeding. I didn't see any good that could come to the company from it; besides I wasn't there as president that day.

"*Q.* After D. C. Mastin had refused to take the property at his bid, what was done next? *A.* It was resold.

"*Q.* Where? *A.* At the courthouse door in Carthage, Jasper county, Missouri.

"*Q.* Then after that David C. Mastin and yourself and Mr. Toms and the trustee went back to the place of sale, did you not? *A.* Yes, went back after the first sale.

"*Q.* Was anyone there when you went there? *A.* I don't recollect about that.

"*Q.* Did you find any persons waiting to bid on the property after you went back? *A.* I don't presume there was anybody there waiting.

"*Q.* Did anyone else come besides those you mentioned? *A.* Well, you mention them over again and I will see.

"*Q.* David C. Mastin, John H. Taylor, W. H. Phelps, William Toms, Henry Ocker, the trustee, and yourself. *A.* Woodard was there besides, Harry Woodard. There may have been others, but these are all that I recollect.

"*Q.* The trustee again offered the real estate for sale at the same place, did he not? *A.* Yes, sir.

"*Q.* John H. Taylor did not bid as much this time by about $300 as he had the first time? *A.* I don't recollect whether there was any difference in Taylor's bid, but the property I think sold for less this time by about that amount than it did the first time; that is, that David C. Mastin's bid was about that much less.

"*Q.* The property was knocked off to your brother at about $300 less than his first bid, was it not? *A.* I think it was about that much.

"*Q.* He took the property at this bid, did he not? *A.* Yes, sir.

"*Q.* If D. C. Mastin had taken the real estate at his first purchase the whole debt and costs would have been paid, and there would have been nothing of the debt left to sell the personal property under, would there? *A.* I think not.

"*Q.* You wanted your brother, David C. Mastin, to buy all this property for the amount of that debt, did you not? *A.* I suggested to him I thought it was a good purchase if he would buy it at that price, and went down there with him for that purpose.

"*Q.* You didn't want him to take the property at his first purchase, did you? *A.* No, sir; I didn't advise him to give that amount for the real estate alone.

"*Q.* You advised him not to take it at his first purchase, did you not? *A.* I presume I did.

"*Q.* He first made the objection on your advice, did he not? *A.* No, sir; I don't think it was. He was looking into the matter pretty closely himself.

"*Q.* After having discovered it, you advised him not to take it at his first bid? *A.* I agreed with him that he shouldn't take it. I am not certain whether he noticed the thing first, or that I did.

"*Q.* You told him you would make no objection on behalf of the company to having it resold at a less amount? *A.* No, I didn't tell him anything of the kind. The company wasn't having it sold.

"*Q.* Had you and your brother David ascertained how much the debt was, previous to bidding? *A.* I presume we had.

"*Q.* Well, after this David C. and you went down to Webb City to attend the sale of the personal property, did you not? *A.* Yes, sir.

"*Q.* How did you and your brother David go to Webb City? *A.* Well, we went in some kind of a conveyance; I don't know whether it was a buggy or a carriage.

"*Q.* Who else went? *A.* Woodard went along, and Toms went along the same morning.

"*Q.* And the sale occurred immediately on your arrival, did it not? *A.* Well, I don't know how soon after we got there; not a great while I suppose; I don't recollect about that.

"*Q.* When was it that David C. Mastin examined the property before the sale? *A.* It was the day before.

"*Q.* Are you sure of that? *A.* Yes.

"*Q.* What time in the day? *A.* Well, I am not sure what time in the day it was. I recollect being at the property with him and going through it; probably it was in the morning.

"*Q.* John H. Taylor didn't go down to Webb City, at least he didn't attend the sale of the personal property, did he? *A.* I don't know whether he did or not; I am not certain; I do not recollect seeing him there.

"*Q.* You and David C. Mastin had assured him that David C. would bid the full amount of the debt— the balance of the debt for the personal property, hadn't you? *A.* I don't recollect about any assurance. I think he felt certain that the rest of the property would bring the amount of money.

"*Q.* Now, isn't it a fact that Taylor had an understanding with you folks that the personal property would bring the balance of the debt, so that it was arranged that he shouldn't go down? *A.* I don't recollect that there was any such understanding. My impression is that Mr. Taylor made the real estate bring so much that he had no doubt about the personal property bringing the balance. I think he arranged that with himself.

"*Q.* Did you have any talk with him about whether you would bid the balance? *A.* I had no talk with him.

"*Q.* You say he had this assurance; you might have bid it in at fifty cents? *A.* Mr. Ocker was there; I didn't know but Mr. Ocker had somebody else to bid. I don't recollect about it, but it is my impression now that somebody else did bid.

"*Q.* Isn't it a fact that no one else bid at that sale of personal property except your brother? *A.* I don't recollect about anyone else bidding, but I would suppose that some one else did bid.

" *Q.* What makes you suppose so ? *A.* Well, they were there selling the property and wanting to get the money, and they had Taylor bid in the first place, and I would suppose they had some one in the second place.

" *Q.* Were you there at the sale of the personal property ? *A.* Yes, sir.

" *Q.* How much did your brother, David C., pay for the personal property ? *A.* I don't recollect the exact amount.

" *Q.* Three hundred and five dollars, wasn't it ? *A.* I couldn't say whether it was $305 or $405. It was about that I think, but I don't recollect the exact figures.

" *Q.* The whole amount realized at both sales was $4,485, wasn't it ? *A.* That is about the amount; I could not say what it was exactly.

" *Q.* And the real estate sold at Carthage for $4,180 ? *A.* About that.

" *Q.* That would leave about $305, wouldn't it ? *A.* I can make the calculation and tell.

" *Q.* That was a cheap lot of personal property wasn't it ? *A.* Yes, I think that is cheap personal property.

" *Q.* What property did your brother get at that sale—I mean the sale at Webb City ? *A.* Oh, he got an engine and some boilers and some jigs, and some other things of that kind. Some property that had cost a great deal of money.

" *Q.* He got all the personal property, machinery, tools and fixtures used in and on the premises of the North Center Creek Mining & Smelting Company, or used in connection with this mining business, and consisting in part of the following property : One large engine, three large boilers, two detached boilers, nineteen steam jigs, one crusher, four steam pumps, two steam hoisters, and all the belts, pulleys and rollers and appurtenances, as well as the blacksmith shop,

office and all the tools and furniture therein, did he not? *A.* Is that the advertisement you are reading from?

"*Q.* That is a copy of the list of property. *A.* Well, if that is a copy of the list of property sold, I would say that is what he got.

"*Q.* Did you intend to buy any of the property at Webb City? *A.* No, I had no use for it.

"*Q.* Well, if you did not, why did you attend the sale? *A.* I suggested to my brother that this property was to be sold under the John Wahl mortgage; that that debt was about $4,500; that I believed in the depressed condition of affairs that he could buy the property at a price at which it would be a good investment, and that I would advise him to do it; and I went along with him because I had made the suggestion, and to show him what it was. I was advising him to buy.

"*Q.* You brought no other person to bid on this property except your brother, did you? *A.* No, sir.

"*Q.* The company had only done business about two years before the sale, hadn't it? *A.* Yes, about that.

"*Q.* All this personal property had been purchased at different times, running through two years immediately preceding the sale, had it not? *A.* Some of it was purchased from Toms with the land; we got that office and furniture, I guess, from him.

"*Q.* This was the largest and best-equipped mining, crushing and ore-dressing works in southwest Missouri or southeastern Kansas, was it not? *A.* That is my opinion.

"*Q.* After the sale D. C. Mastin appointed William Toms his superintendent, did he not? *A.* Yes, sir.

"*Q.* Who suggested to him to appoint William Toms as his superintendent? *A.* I think I did, sir."

Being asked about the ore that was on hand at the time of the sale, he replied: "Well, my opinion is this: D. C. Mastin had told John J. Mastin he might go there

and run the works, but not to get him indebted, and if there were any profits they should be his. John J. Mastin couldn't run the works under his own name, because he had incurred some liabilities on account of the Mastin Bank, and they were hanging over him. My opinion is it was D. C. Mastin's ore. If there had been any profits in the running of the works he agreed to give it to John J."

As to what occurred at the sales, David C. Mastin testified as follows :

"*Q.* You did not take the real estate at the price for which it was first sold to you ; is not that a fact? *A.* I don't remember particulars.

"*Q.* After you got to Mr. Phelps' office you objected to taking the property at the price you bought it at? *A.* I don't remember what all the folks done at Phelps' office.

"*Q.* John J. Taylor attended the sale of the real estate? *A.* I think Taylor was there. I don't remember his initials.

"*Q.* When it was first offered did not he bid the whole amount of the Wahl debt and costs for it? *A.* I don't know, sir.

"*Q.* Did you not then bid a few dollars more and it was knocked off to you? *A.* I don't remember.

"*Q.* Did not some person in your presence and hearing ask Taylor to make a smaller bid? *A.* I don't remember it.

"*Q.* Who asked Taylor to bid less? *A.* I don't know that anybody did.

"*Q.* Is it not a fact that after you objected to taking the property at your bid, you and others went to Taylor and asked him to make a lower bid? *A.* It is not a fact.

"*Q.* Taylor stood ready at the second sale to bid the whole amount for the real estate, did he not? *A.* I don't know whether he did or not.

"*Q.* Didn't you and Phelps assure him that you would bid the balance on the personal property if he

would consent to bid a less amount? *A.* I don't think I spoke to Taylor before the sale. I don't remember of speaking to him at all on that subject.

"*Q.* Did anyone else, in your presence and hearing, give Taylor any such assurance? *A.* I don't know of any assurance given him by anybody.

"*Q.* Were Taylor and yourself in Phelps' office after the first sale, and was any such conversation then had between Phelps and Taylor in your presence? *A.* I don't remember of any.

"*Q.* Do you remember that you and Taylor were in Phelps' office just after the sale? *A.* No, sir.

"*Q.* Did you not go from there to the place of sale again? *A.* I don't remember it at all.

"*Q.* And after you got there did not Taylor bid about $300 less than the whole debt and costs, about $300 less than his first bid? *A.* I don't remember what he bid.

"*Q.* And then you bid about $5 over his bid and it was knocked off to you? *A.* I don't remember what I bid over him.

"*Q.* Did you bid more than once at the first sale? *A.* I don't remember.

"*Q.* Do you remember whether or not Taylor bid at this first sale? *A.* I think he did, but don't know.

"*Q.* Do you remember whether or not the property was twice offered for sale before it was finally knocked off to you at this first sale? *A.* I don't remember.

"*Q.* You took the property at this bid, did you? *A.* I don't know what bid you mean.

"*Q.* I mean that you bid about $5 over Taylor's bid, which was for $300 less than the Wahl debt and costs? *A.* I don't remember my bid or Taylor's bid, if he bid at all.

"*Q.* Did you, at any time on the day of that sale, make any objection to taking the property for the amount which you bid? *A.* I don't remember.

"*Q.* T. H. Mastin was present with you from the time that the property was offered for sale until it was finally knocked off to you, was he not? *A.* I don't remember whether he was or not.

"*Q.* Did you and he have any conversation that day as to your taking the real estate at the amount of your bid? *A.* I don't remember.

"*Q.* Did he advise you to object to the first sale? *A.* I don't remember whether he did or not.

"*Q.* As a matter of fact, did you object to the first sale? *A.* I don't remember.

"*Q.* Did not T. H. Mastin tell you not to pay much more than the Wahl debt for the property? *A.* I don't know what he said.

"*Q.* After the real-estate sale at Carthage, you went to Webb City, did you not? *A.* I think so; I don't remember who went with me.

"*Q.* Who else went down? *A.* Don't know.

"*Q.* How did you go? *A.* I think I was in a buggy.

"*Q.* What time did you get to Webb City? *A.* Don't know.

"*Q.* You bought in the personal property at Webb City, did you not? *A.* That is my recollection.

"*Q.* What property was included in that purchase? *A.* I think it was all the personal property then belonging to the company.

"*Q.* Was it all sold together? *A.* I don't remember.

"*Q.* What did you pay for it? *A.* I don't remember.

"*Q.* Was it not $305 you paid for it? *A.* I don't remember.

"*Q.* Did you get a bill of sale for the property from the trustees? *A.* I presume I did.

"*Q.* Do you know whether you have that bill of sale now or not? *A.* No, sir.

"*Q.* Was not the price paid for the personal property a very small price for that property? *A.* I supposed the property to be worth that and more, too, or I would not have bought it."

Thomas H. and D. C. Mastin returned to Kansas City. What was done with the property after the sale is told by John J. Mastin as follows: "*Q.* How soon after that property was sold under the Wahl mortgage did you go down to Webb City? *A.* I went on Thanksgiving Day, if you can calculate the time it was sold until that day.

"*Q.* It was Thursday after the sale? *A.* Yes, Thursday after the sale, I suppose.

"*Q.* How did it happen that you went down there? What were the circumstances under which you came to go? *A.* I had learned that he had bought that property, and I had learned that Toms was left there as superintendent to manage it. I was perfectly satisfied that under that kind of an arrangement to run the mines, knowing what I did of the results of the way they had been run before that, but it would be but a very little time until they would break my brother up, and I didn't want to have that done, of course. And I suggested to my brother, David C. Mastin, that I should go and take charge of the property, and handle it for him. The reason that I could at that time do that, and the reason I happened to do that, to make him that kind of a proposition, was that I was out of business, and had nothing to do. Well, the result of it was that Dave, my brother, finally agreed that I should go and take charge of the property and operate it and have all that I could make out of it, provided that I would be very careful not to incur any liability that would come against him—that he would have to pay out any money for; and I went down to take charge of the property, and I got there, and found it just as had been stated. Toms was there acting as superintendent. This fellow Wilcox was there acting as cashier and bookkeeper,

and after having been there for a day or two, or a few
days looking around, I discharged Mr. Toms, didn't need
him ; discharged Wilcox, and run the property the best
I was able, and the way I thought was most likely to
result profitably.

"*Q.* How long did you remain there? *A.* I
remained there until April or May following; I don't
recollect the exact time I left.

"*Q.* Could those mines be managed at that time
with much profit, or any profit; just state to the court?
*A.* No, they were not managed with much profit. My
impression is now that I run it up about even. With
the ore that had been taken that this suit is pending
about with McBride, probably there would have been a
few hundred dollars, $1,000 or $1,200 profit in it.

"*Q.* Then you say you staid there until the next
summer? *A.* I staid there until the next spring.

"*Q.* What did you then do with the mines? *A.*
Left them in Potter's charge.

"*Q.* How long did he remain there? *A.* I don't
remember; not a great while. The thing didn't pay at
all. Got so there was danger of running in debt and
we quit the business.

"*Q.* Who commenced to operate the mines after
Potter left? *A.* I think it was Robinson and Hall.
I think Robinson had the interests of D. C. Mastin at
least, and Hall went on his own account.

"*Q.* Who were the mines operated for? *A.* They
were in fact operated for David C. Mastin.

"*Q.* Who was to receive the benefits? *A.* I was,
if there was any profits.

"*Q.* Please explain what you mean by that; were
you to pay the expenses? *A.* Yes, sir.

"*Q.* All the expenses that were paid? *A.* It was
not to cost—the property was not to cost—the operating
of the property was not to cost David C. Mastin any-
thing, and any profits that might accrue or result from
the operation of the property was to be mine.

Woodard v. Mastin.

"*Q.* You were to pay the expenses of operating it? *A.* Yes, sir.

"*Q.* You were to receive the proceeds of the ore you sold for your own benefit? *A.* All the profit there was on it I was to receive. You understand the property was operated in the name of David C. Mastin, for him and on his account; and for operating it I had the profits, and was to hold him harmless against any loss. That was the contract exactly.

"*Q.* Did he have any control of the operation of them in any way? Did he exercise any control over it after you went down there? *A.* No, sir.

"*Q.* You attended to all yourself? *A.* Yes, sir.

"*Q.* You paid the taxes, did you? *A.* Yes, sir; that is had it done.

"*Q.* You sold the ore? *A.* Yes, sir.

"*Q.* And applied the proceeds of it to the payment of the debts and expenses of operating it? *A.* Expenses of operating it.

"*Q.* Did D. C. Mastin ever operate the mines at Webb City, or were they ever operated for his benefit after you went down there? *A.* Except just as I have stated.

"*Q.* After this who was the owner of the royalties that were paid by the various companies that operated this land? *A.* I have been receiving the royalties myself. There was a long time there wasn't any royalties received.

"*Q.* All the royalty that has been received from this land, who received it? *A.* I think I have.

"*Q.* Did you ever pay any of it to D. C. Mastin? *A.* No, sir.

"*Q.* Did you apply it to your own use? *A.* Yes, sir.

"*Q.* Was that the arrangement between you and your brother? *A.* Yes, sir.

"*Q.* Was the arrangement that you were to have the use of these royalties? *A.* Yes, that is the arrangement.

Woodard v. Mastin.

"*Q.* Who owns the land in controversy now? *A.* I do.

"*Q.* What did you pay for it? *A.* I paid him what it cost him, with interest on it; I don't just recollect what it was.

"*Q.* Was a deed ever delivered to you for this property? *A.* I don't think it was; I don't think there ever was a deed delivered.

"*Q.* Was there ever a deed made to this property? *A.* I don't know whether there was or not. Dave thinks there was, and I suppose there was, or should have been. I suppose there was and it ought to be in existence.

"*Q.* If there was such a deed made it was lost or destroyed? *A.* Lost or mislaid, not destroyed.

"*Q.* Well, you don't know where it is now? *A.* No, I don't know where it is.

"*Q.* Was the deed ever recorded? *A.* No, I think not.

"*Q.* Was the deed acknowledged? *A.* I don't know anything about it. If it was executed it was acknowledged.

"*Q.* When did you make this arrangement with your brother? *A.* It has been several years ago; I don't recollect exactly.

"*Q.* Was it previous to the commencement of this suit or since? *A.* I am inclined to think it was since. I am not positive about that.

"*Q.* You say that this deed was never delivered to you? *A.* No, I didn't say that. I say, I don't think it was. If it was it was lost or misplaced, so I don't know where it was.

"*Q.* What property was included in this deed to you, if one was ever made? *A.* All the property he had at Webb City; all that he bought down there; everything that he had.

"*Q.* Then it is a fact, is it not, Mr. Mastin, that all the benefits and profits that ever were derived from

this land were derived by you after the Wahl sale?
*A.* Yes, sir.

" *Q.* Then D. C. Mastin didn't receive anything?
*A.* Didn't receive anything.

" *Q.* But you operated them, and was receiving the benefits, and your brother sold it back to you? *A.* He never bought it from me.

" *Q.* Well he sold it to you for about the same price he paid for it? *A.* Yes, sir.

" *Q.* Wasn't the personal property conveyed at the same time the real estate was to you? *A.* Everything conveyed at the same time, yes.

" *Q.* Was there two conveyances, one for the real and one for the personal? *A.* No, there wouldn't have been any occasion but for one.

" *Q.* (By court). Was there ever any arrangement made with you for the sale under the judgment in which your brother bought this bank judgment—any other different arrangements made with you from what was made before? *A.* No, sir.

" *Q.* (By court). After that sale the arrangement went on just the same as it was before? *A.* Just as it was before.

" *Q.* (By court). When was this deed made to you, if any was made, from your brother? *A.* I think it was made about three years ago, is my recollection.

" *Q.* (By court). Was that made after this sale under judgment? *A.* I think it was.

" *Q.* (By Montgomery for plaintiff). Are you positive it was made after or before? *A.* After 1881; yes, sir, I am positive of that.

" *Q.* (By Phelps for defendant). Did you and your brother have settlements from time to time, from the time you went down there up to the time you made this purchase of him and he made the deed? *A.* No, we had no settlements, I don't think, at all, up to that time.

"*Q.* ( By Montgomery for plaintiff ). You had no accounts to settle ? *A.* No.

" *Q.* There were no business transactions to settle ? *A.* No business transactions to settle."

D. C. Mastin testified he never saw this property after he purchased it. The three Mastins say D. C. Mastin paid the money bid at the sales under the deed of trust. Thomas H. Mastin testified that the debts of the North Center Creek Mining & Smelting Company at the time of the trustee's sale amounted to about $75,000. The testimony of these three men tells its own story. It convicts them of fraud beyond any question. It is too plain for argument. Thomas H. Mastin was the moving spirit in the sale under the deed of trust, and D. C. Mastin was his willing tool. It took some manipulation to get all the property into the name of D. C. Mastin on the day of the sale ; but the parties were equal to the emergency. Thomas H. Mastin's conduct was utterly inconsistent with an honest purpose on his part. This fraud is palpable and plain and manifest upon the showing made by these parties themselves, but, when the evidence introduced by plaintiff is considered in connection with it, the proof of the fraud is simply overwhelming. The object was not only to defeat the creditors but also to freeze out all stockholders of the company except the Mastins.

Here is Wm. Toms' story as given in depositions of his read in this case : " Shortly before the sale under the John Wahl mortgage, the president, Thomas H. Mastin, told me that he had a talk with Mr. Wahl, in which he told Mr. Wahl that he had better close out the mortgage. And, prior to this, I had also seen Mr. Wahl, and by directions of Thomas H. Mastin, the president, told him he had better close out under his mortgage, and Mr. Wahl told me that he did not want to do it. He did not want to have any trouble about getting his money. It was advertised and sold. I do not know who did it. Thomas Mastin told me that

Woodard v. Mastin.

inasmuch as things were getting in bad shape we had better have it sold under that mortgage; that the company was largely indebted, and we had better have it sold out under the Wahl mortgage; and that he would get his brother, David C. Mastin, to buy it in; that it would make no difference so far as this company is concerned; that I should still have my position in the company and also my interest. The reason that I would be protected was, that my wife had a vendor's lien on the property, prior to the Wahl mortgage, and that our interest could not be hurt by the sale. He said that after the sale took place they would organize a new company and fix it all up in Kansas City. This was about all that was said at that time. He said at that time, in the presence of Mr. Wilcox, that I would be protected, and the company could go on as usual.

"At the time of this sale the concern was, I suppose, in debt to the amount of $30,000 or $40,000. I think about $15,000 of this was in favor of the Metropolitan Bank of New York; the Mastin bank, $10,000 to $15,000; Girard B. Allen, of St. Louis, about $2,000; John Goodin, of St. Louis, about $1,000; N. M. Barney, of Joplin, about $700 or $800; George Felber, of St. Louis, about $500; the Joplin Coal & Mining Company, about $600 or $700. There was Riseling, Joplin Gas & Coke Company, and quite a number of others. Harry Woodard, some $2,000. There was also a judgment in favor of L. D. Boone, in the United States court, for about $700.

"Q. State whether or not it was the object and intention and understanding between you and Thomas H. Mastin, two of the directors of the company, to procure a sale to be made under the Wahl mortgage, and to have David C. Mastin buy the property in at that sale, for the purpose of hindering and delaying the creditors of the company, and in defrauding them in the collection of their claims against the same? A. Not on my part.

" *Q.* Please state what the object was. *A.* The president of the company had got in bad shape, and that it would stop all further trouble. I was present at the sale of this property at Carthage. It took place at the courthouse door in the city of Carthage. There were two sales of the property that day. The first sale was about noon. They found out that there was something wrong about the sale, and they sold it over again. I was present at both sales ; also, Thomas H. and David C. Mastin, W. H. Phelps, John H. Taylor, Mr. Ocker, trustee, and several others. The description of the property was read by Mr. Ocker, trustee, who said he was going to sell it for the benefit of John Wahl under the mortgage. Before he commenced to sell I notified every one in hearing that I had a lien on that property for my wife, for some $25,000, and accrued interest. I think Mr. John H. Taylor bid for John Wahl the amount of his claim, and then David C. Mastin bid, and it was knocked down to him. We all then went up to Phelps' office. There were David C. Mastin, Thomas H. Mastin, Mr. Ocker, John H. Taylor and myself. They went into an inner room, the two Mastins, John H. Taylor, Mr. Ocker, and Mr. Phelps. This meeting in Phelps' office was after the second sale.

" After the first sale at the courthouse door, Thomas H. Mastin, David C. Mastin, W. H. Phelps, John H. Taylor, O. H. Ocker and myself went directly to Mr. Phelps' office, and after some conversation between the above parties, in which I took no part, Mr. Phelps commenced to write the deed, and for some reason unknown to me they went back to the courthouse door and resold the property, the same party, David C. Mastin, buying it. Went from there to Mr. Phelps' office, went into the room, where the transaction was had as above described. The same persons bid on the property at both sales, and it was knocked down and sold to David C. Mastin both times. I think there was only two bids at each sale, the first by John H. Taylor

and the second by David C. Mastin. I think the same amount, or about the same amount, was bid at both sales, and that it was resold on account of some defect which I, at that time, heard of, but do not now remember. They said it did not amount to anything, but they wanted to get it all right.

"The day before the sale Thomas H. Mastin came over to Webb City, and told me it was arranged, that he would see David C. Mastin in Carthage the day of the sale. The day of the sale Thomas H. Mastin and myself went to Carthage, and we met David C. Mastin prior to the sale. We walked around a little, and then went down to the courthouse, where the sale took place as above described. After we got through with the sale we all went to Webb City. That is, I mean Thomas H. Mastin, David C. Mastin and myself. I did not have any conversation either before or after the sale with David C. Mastin concerning the sale, or the property to be sold, and I thought this very strange. After the sale when we got to Webb City, Thomas H. Mastin said to David C. Mastin that he had better give me authority to act as his agent, and take charge of the works. He then wrote and gave me written authority which I have since lost or destroyed. It was worded something this way: 'I hereby appoint Wm. Toms to act as my superintendent in the purchase and sale of ore, and in the management of my affairs at Webb City.' I went on and took charge of the business as usual as I had been doing, and carried it on until John J. Mastin came down about a week after David C. Mastin bought the property, and John J. Mastin stayed around there a few days and had me go to St. Louis to buy a pump and engine. I came back from St. Louis and found that he had been changing things around, and running things different from what I had been doing. I told him that if he was going to run things that it was not necessary for me to remain any longer, and he said that he guessed he would run things awhile, and I then left.

Afterwards I commenced suit against John J. Mastin for possession of the works and he and I compromised; he agreed to give me a lease for a certain length of time, a year I think. I do not think David C. Mastin's name was ever named in my presence in reference to this compromise. I did not see David C. Mastin to become acquainted with him until he came down to buy the works. He had never, to my knowledge, been down to see the works prior to the time he purchased them. After having purchased them he came over to the works and staid around about an hour, and went through them. I think they, David C. Mastin and Thomas H. Mastin, came over to Joplin that night. When David C. Mastin came down to the works, there was about fifty or sixty tons of zinc ore on hand. I think this mineral and other traps on hand were sold to David C. Mastin. I think he gave his note for the amount, and I do not know what became of it. I turned over the truck to him, as superintendent, by the directions of Thomas H. Mastin.

"I told Mr. Thomas H. Mastin prior to the sale that there were some debts I had contracted for the company myself, that had to be paid. Amongst them was Girard B. Allen and John Gooding. He told me then that if the sale took place, to David C. Mastin, either under the mortgage or vendor's lien, that it would make no difference, but that the works should be carried on just the same; that, if it was sold under the vendor's lien by Mrs. Toms, the Mastins were to have their interest as it then existed, and if it was sold under the John Wahl mortgage, and David C. Mastin became the purchaser, that the witness and his wife should retain their interest as it then existed; and in either event I was to remain superintendent of the works, and they should go on as before. My duties as superintendent would allow me to pay any debts that I had contracted previous to the time of sale and afterwards.

"Cross-examination: John Mastin, when he took possession of the works and relieved me, stated that he was acting for David C. Mastin. I believe he leased me the property. That is the lease referred. to by me in my direct examination as agent for David C. Mastin. I think the amount paid for the property by David C. Mastin at the mortgage sale was about $4,000, something over that amount."

F. L. Wilcox testified: "I was cashier and book-keeper for the North Center Creek Mining & Smelting Company, in 1879. The company was considerably indebted in the year 1879. The indebtedness amounted to between $20,000 and $30,000. The company was indebted to Girard B. Allen & Co., John Gooding & Co., Moffet & Sergeant, St. Louis Car Wheel Company, Joplin Gas & Coke Company, L. Riseling, N. M. Barney, L. D. Boone, the Carthage Foundry Company, F. L. Wilcox, Harry Woodard, the Mastin Bank and the Bank of Carthage. There was some other firms, but I cannot call them to memory now. In the year 1879, Thomas H. Mastin, Wm. Toms and myself were in the company's office in Webb City, Missouri, before the sale under the Wahl mortgage, and Thomas H. Mastin requested William Toms to go to St. Louis and have John Wahl to foreclose the mortgage mentioned above. Wm. Toms said that he would. Thomas H. Mastin said that he wanted to prevent L. D. Boone taking any action against the North Center Creek Mining & Smelting Company for the debt owing to him (L. D. Boone). A short time after Wm. Toms returned from St. Louis, I had a conversation with Thomas H. Mastin, and he told me that he had been to St. Louis and saw John Wahl, and John Wahl had consented to foreclose the mortgage. He also said that himself and brother, J. J. Mastin, would furnish the money to buy the mortgage in the name of D. C. Mastin, the defendant in this suit, and also for me not to pay any claims against the company, any more than I could possibly

help. He said they were going to organize as soon as possible under a new name, and then start without owing anyone anything. He said this action was taken to prevent all parties from commencing suit for the different debts the company owed different parties. This last conversation was before the Wahl sale. I had another conversation with him after the foreclosure of the mortgage in the evening, in which he said for me to go right along in the same capacity as I was, and the company would go under the name of D. C. Mastin until they could reorganize, and all the old debts would be wiped out. He said the property would be held in the name of D. C. Mastin for the time being.

" After the sale under the Wahl mortgage, in the last of November, or first of December, 1879, I had a conversation with J. J. Mastin, in which he said that he and Thomas H. Mastin had furnished the money to buy the mortgage, and that he would run the business under the name of D. C. Mastin, and for me not to pay anything due from the company, except the men, and what was due in Webb City. I asked him about the amount due me from the North Center Creek Mining & Smelting Company. He said that I should have every dollar that was due me, and that he might pay some other claims that was due by the company, but that he need not unless he wished. A day or two after that he said he had made up his mind not to pay any except the amount due me, except the wages and amounts due in Webb City. I asked him about the money to pay off the employes and the amounts due in Webb City. He said he brought money from Kansas City to pay all these claims.

"The company owed me at the time of the Wahl sale $706 and some cents. The company or John J. Mastin never paid me the amount due me. I placed the claim in the hands of an attorney for collection, but through some mistake the judgment was rendered in my favor for only $106 and something. In the last of September, 1878, J. J. Mastin, in Kansas City, in the

Mastin Bank, employed me to go down to Webb City and act as bookkeeper and cashier of the North Center Creek Mining & Smelting Company, and ·gave me a letter to Wm. Toms, stating that I was to look after the interest of John J. Mastin and Thomas H. Mastin in said company, and John J. Mastin made the bargain with me for my wages. I understood that J. J. Mastin was one of the directors of the North Center Creek Mining & Smelting Company.

"I remember the circumstance of the sale of the personal property of said company at Webb City, under the Wahl mortgage. I was at the works the day previous to the sale. D. C. Mastin was not at the works on the day previous to the day of that sale. D. C. Mastin did not go through the works of that company and examine them the day previous to that sale. He did not go through the works and examine them the day of that sale. I was at the works of the company the day after the sale. I did not see D. C. Mastin at the works the day after the sale. I did not see Thomas H. Mastin at the works on the day previous to the day of that sale. I never saw D. C. Mastin at the works on any other day other than the day of the sale. I was around the works every day for a long time previous to the day of the sale and after the sale until I quit work as bookkeeper and cashier, on or about December 5, 1879. I quit work as bookkeeper and cashier of the company about from the first to the fifth of December, 1879.

" After I quit work as bookkeeper and cashier, John J. Mastin wished me to remain and oversee the ·mines during the night during the month of December, 1879, and I remained in that capacity during the month of December, 1879. During that time I was not around the mines much except during the night. I never knew of D. C. Mastin being present at the works at any time, except on the day of sale.

"Q. Please state whether or not you were acquainted with the property sold under the Wahl mortgage? A. I was.

"*Q.* State whether or not you were acquainted with the value of the property at the time it was sold? *A.* I had a very good idea of the value of it.

"*Q.* State whether or not you were familiar with the value of properties, both this and other properties in the vicinity of this property? *A.* I was.

"*Q.* State what, in your judgment, the property of said company sold under the Wahl mortgage was worth at the time it was sold by the trustee; I mean both real and personal property? *A.* Seventy-five thousand dollars.

"*Q.* Was there any zinc ore or other minerals on hand at the works on the day of the sale under the Wahl mortgage? *A.* Yes, there was some on hands. There were two piles, aggregating sixty tons of zinc ore, in two piles. I don't know what became of the ore, or who sold it, or who received the money for it. The works were running on the day of sale. They were running while the sale was going on. The ore that they produced during the sale, and after the sale, was put on the same piles with that that was taken out before the sale. There was not, to my knowledge, any inventory of the ores on hand made on the day of the sale, or soon after the sale. There was no entry of anything of the kind made, nor was there before the day of sale. The whole works, including the reduction and cleaning works, were running on the day of sale, and the ore cleaned up was dumped on the piles cleaned up before the day of sale.

"I was never re-employed as cashier and book-keeper by anyone on or after the day of sale. D. C. Mastin never employed me on the day of sale or at any time after, to keep the books, or act as cashier. D. C. Mastin never gave me any instruction on or after the day of sale, concerning the works. I never had any conversation with him at any time. The same men continued after the sale that worked there before. The company mined their own ground before the sale, and

employed quite a number of men. These men con-
tinued to work right along after the day of sale the
same as before the sale. I paid these men for their
work on the first day of December, for the month of
November, for the whole month of November, both for
the time they worked previous to the sale and their
work after the sale. J. J. Mastin gave the money to
me to pay these men both for the work done before the
day of the sale, and the work done after the day of the
sale."

Walter Tholtorn testifies that he was present at the
sale of the personal property under the Wahl deed of
trust at the office of the company in Webb City. He
testified as follows:

"Q. While the sale was going on, where was
Thomas H. Mastin and William Toms? A. Standing
at the southeast corner of the office, on the scales.

"Q. Did you hear any conversation between them
while they were right there at the sale? A. That was
while the sale was going on.

"Q. How close to where the sale was going on?
A. The sale was going on in the office, and the scales
were on the east side of the office, and they were stand-
ing on them, on the platform.

"Q. About how far from the other men, who were
selling the property? A. They were outside and he
was inside; I don't suppose over twelve or fifteen feet.

"Q. Did you hear any conversation between
Thomas H. Mastin and William Toms, while the sale was
going on? A. Yes, sir.

"Q. Was D. C. Mastin present? A. He was
inside, and they were outside.

"Q. Well, state the conversation you heard
between those two men. A. Thomas H. Mastin says
to Mr. Toms: 'Never mind about this sale, we will go
to Kansas City and organize a new company, and you
can hold your position just the same. It will be all
right.'

"I would say the whole property real and personal was worth $40,000 at the time of the sale." Mr. Reed, another witness, fixed the value of the property at the same figure.

As to the subsequent sale of this property to David C. Mastin by the United States marshal, the record shows this state of facts: On the twenty-first day of May, 1879, the Metropolitan National Bank of New York recovered judgment in the circuit court of the United States for the western division of the western district of Missouri against the North Center Creek Mining & Smelting Company, John J. Mastin and Thomas H. Mastin for the sum of $18,334.46. On June 2, 1879, execution issued on this judgment, and was levied on the land and mining plat of said company, which was, on September 4, 1879, ordered returned unsatisfied by direction of plaintiff's attorneys, Karnes & Ess, of Kansas City. On the twenty-sixth day of February, 1881, these attorneys, acting for the plaintiff bank, ordered another execution on such judgment which was issued February 28, 1881, and on March 19, 1881, the marshal levied on the northwest one-half of the northwest quarter of section 17, township 28, range 32, and on April 19, 1881, sold the same to D. C. Mastin for $125. The marshal executed a deed to D. C. Mastin under this sale which was not recorded till December 29, 1886.

D. C. Mastin testified as follows, after being asked some question in regard to the Metropolitan Bank of New York:

"*Q.* Did it have a claim against the Center Creek Company? *A.* I do not ——

"*Q.* Nor do you remember what kind of a claim this was, or what the bank did in the way of collecting? *A.* No, sir.

"*Q.* Do you know who the claim was against? *A.* No.

"*Q.* Did it sell any property on its claim, and if so, when, and what property did it sell? *A.* Don't know.

"*Q.* Do you know who was present at its first sale, or who attended to having the publication made? *A.* No.

"*Q.* Can you state who bid at that sale, and what property was bought? *A.* I don't remember.

"*Q.* Was not the property knocked off to you at the first sale under the Wahl deed of trust? *A.* I think so, or a part of it. I don't know whether it covered it all or not.

"*Q.* Did you pay the purchase price yourself direct to the marshal, or did some one pay it for you? *A.* I furnished the money.

"*Q.* When did you get your deed? *A.* Don't remember.

"*Q.* What did you do with it? *A.* Don't remember.

"*Q.* Do you remember when it was recorded? *A.* No, sir.

"*Q.* How did you find out that the property was advertised for sale under the Metropolitan National Bank judgment? *A.* Don't know.

"*Q.* Were you present at the sale? *A.* No, sir."

Thomas H. Mastin says he does not remember of having the property advertised for sale under this execution, but Clark Craycroft testified that Thomas H. Mastin told him he was going to have the land advertised under it. Thomas H. Mastin testified that he and John J. Mastin had paid off this judgment, but he could not tell when.

It was agreed in open court that the debt due John Wahl at the time the sale took place under the deed of trust was $4,343.27; that the amount realized at the sales of the real and personal property was $4,485, and the expenses of the sale were $136.45, leaving after the payment of the debt and expenses a balance of $5.28.

There were no "vermiculations" about this transaction. It is what might be called a plain, straightforward fraud. It was published in Carthage, and made known at Webb City. The Mastins went to work deliberately to wreck, and they did wreck, this company for the purpose of defrauding the creditors and getting rid of all the stock not held by them. The fact that the Wahl deed of trust was a valid, *bona fide* one cannot relieve these parties from the effect of their fraudulent conduct.

II.   It is the settled law of Missouri that lands fraudulently conveyed may be sold on execution of a creditor as though no such conveyance had ever been made, and the purchaser, upon proof of the fraud, is entitled to a decree vesting the title in him. R. S. 1889, sec. 2499 ; *Slattery v. Jones*, 96 Mo. 216 ; *Jacobs v. Smith*, 89 Mo. 673 ; *Lionberger v. Baker*, 88 Mo. 447. And in such case the fraudulent grantee will be decreed trustee for the purchaser.

III.   "Inadequacy of consideration is no defense to a title obtained by plaintiff at a sheriff's sale, where this result was due to the efforts of the defendants to place their property beyond the reach of their creditors." *Rinehart v. Long*, 95 Mo. 396 ; *Boyer v. Tucker*, 70 Mo. 457.

IV.   It appearing to the court from the record that defendants have received enough and more than enough from the personal property and real estate other than the tract in controversy here and from the income derived from the property, prior to plaintiff's purchase in December, 1884, to reimburse them for the amount paid on the Wahl deed of trust, the question as to whether they are entitled to a set-off for that does not arise in this case for decision.

Thus far we have had but little trouble in reaching conclusions, but the contemplation of the results to flow from a decree granting plaintiff all the relief he seeks gives us pause.   The plaintiff bought the land at a public

sale for $50, but we do not lose sight of the fact that, if he fails in this case, he loses all his debt, which now amounts to about $2,500.    He is entitled to some relief, but what, is the question.    If we order the circuit court to set aside the fraudulent deeds, vest the title to the property in plaintiff and order an account taken of the rents and profits of the land since 1884, now seven years, plaintiff would probably get more than twenty times his debt, costs and expenses of this litigation.    While the bill in this case seeks to set aside deeds and vest the title in plaintiff, we have come to the conclusion that we are not bound to grant relief in the exact form in which it is sought, but that we can fix conditions upon which we grant relief conformable to the facts alleged and proved.

When a court of equity gets jurisdiction of a case it retains that jurisdiction till complete justice be done. "He who seeks equity must do equity," is not only an established, but a very just, maxim.  Speaking of this maxim, Judge SHERWOOD in *Whelan v. Reiley*, 61 Mo. 565, uses this language : "The true meaning of the rule whose frequency of invocation would seemingly argue a better knowledge of its import, that 'he who seeks equity must do equity,' is simply this, that, where a complainant comes before a court of conscience invoking its aid, such aid will not be granted except upon equitable terms.    These terms will be imposed 'as the price of the decree it gives him.'    The rule 'decides nothing in itself,' for you must first inquire what are the equities which the plaintiff must do in order to entitle him to the relief he seeks. *Hanson v. Keating*, 4 Hare, 1 ; *Neesom v. Clarkson*, 4 Hare, 97 ; *Phillips v. Phillips*, 50 Mo. 603 ; *Erwin v. Blake*, 8 Peters, 18 ; Sto. Eq. Jur. [13 Ed.] 642."

In the case of *Bennett v. Hutson*, 33 Ark. 762, EAKIN, J., speaking of cases of this character, uses the following language :   "Under this statute the practice has grown up of levying upon such equitable interests as debtors are supposed to have in property held in the

Woodard v. Mastin.

name of others, under conveyances thought to be fraud-
ulent, buying it in for a trifle, and then filing a bill to
enforce the rights, whatever they may be. At such
sales there can be no competition. They become mere
speculations; and oftentimes vast interests of innocent
widows and children are swept away in consequence of
attempted frauds on the part of those on whom they
depend, which go to enrich creditors who were entitled
to their debts, and nothing more. Whilst this court
has been constrained to give reasonable effect to the act,
and sustain sales of equitable interests in some cases, it
has nevertheless appreciated the full force of the dan-
ger and injustice of the practice; and, wherever the
equitable interest has not been well defined and market-
able, has strongly disapproved of such proceedings.
There can be no objection to making the levy; and
where the equitable interest is ascertainable, like an
equity of redemption under an undisputed mortgage,
or trust deed, for specified debts, no injustice can result
from proceeding with the sale. But in all cases where
a bill in chancery will, in any event, be necessary,
either to fix an equity or determine its extent, every
consideration of humanity, justice, fair dealing and
public policy demands that it should be first fixed and
ascertained, and then sold for its fair value. Where
there must be a lawsuit, sold and bought, the competi-
tion will be only amongst speculators and those of a
class not to be encouraged. Generally, the creditor gets
the land, and retains the greater part of his debt." We
heartily approve this language.

In this case the court set aside the fraudulent
conveyance, and also plaintiff's deed, and declared
plaintiff's claim a lien on the property and ordered the
property sold to pay it. Thus, while the action was to
set aside deeds and vest the title to property in plaintiff,
the court set aside the deeds of both parties and granted
plaintiff the relief he would have obtained if he had
filed a creditor's bill in the first instance. To the same

effect is the case of *Apperson v. Burgett*, 33 Ark. 328. Mr. Bump in his work on fraudulent conveyances, 567-8, quoting these two Arkansas cases, uses this language: "It has, however, been held, that, if the execution creditor was the purchaser, the purchase might be disregarded and the property sold to satisfy the judgment."

The plaintiff in the case at bar is the execution creditor; he purchased the property for a very small sum; he waited four years before taking steps to enforce his rights, and we feel it would be inequitable to give him all he asks. He has, however, alleged and proved a good case for equitable interference. It would not be just to him to give him simply his debt with interest and costs, while he has been forced to expend money in the pursuit of his claim. He bought property worth $50,000, and has proved that defendant's title is based on fraudulent conveyances. We could give him this whole property under the repeated rulings of this court; and, if we give him less, defendants certainly ought not to complain; and, if we give him his debt and interest with the expenses he has been put to in this litigation by defendants, he ought not to complain. We have fixed the expenses of the litigation, including attorney's fees, at the sum of $500, deeming that reasonable, considering the nature of the litigation and the amount involved. Under the general power of a court of equity to compel a party asking equity to do equity, and the above authorities, we order that the judgment in this case be reversed, and the cause remanded with directions to the circuit court to set aside the fraudulent deeds, and also to set aside plaintiff's deed to the property, and take an account of the amount due plaintiff on his judgment, together with the costs of the original suit and this suit, including the costs of the sheriff's sale, to the plaintiff, and add to that the sum of $500 for expenses of this litigation, declare the sum thus

ascertained a lien on the property in dispute, and to order its sale for the payment of the same. All of this division concur.

### ON MOTION TO MODIFY JUDGMENT.

THOMAS, J.—On plaintiff's motion, the judgment in this case is modified so as to direct the circuit court to take an account of the amount due plaintiff on his judgment, together with the costs of the original suit and this suit, including the costs of the sheriff's sale, to plaintiff, and also the amount of expenses to which plaintiff has been put in this case, including a reasonable attorney's fee and fees for printing the record, abstract and brief for this court, and for necessary time lost and traveling expenses in preparing for and attending the trial, declare the total sum thus found a lien on the real estate in dispute, and order its sale for the payment of the same. All concur.